ELIZABETH FARRELL, OSB No. 011107
Attorney at Law
E-mail address: farrelllaw@hotmail.com
0324 SW Abernethy Street
Portland, OR 97239
Telephone: (503) 277-2087
Facsimile: (503) 357-4181

Attorney for Plaintiff-Relator

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA EX REL., CRAIG BEAUCHAMP, <br><br> Plaintiff-Relator, <br><br> v. <br><br> CHICAGO BRIDGE & IRON COMPANY, a Delaware Corporation, LUTECH RESOURCES, INC., a Delaware Corporation, and MCDERMOTT INTERNATIONAL, INC., a Texas corporation, <br><br> Defendants. | Case No.  3:18-CV-1055 <br><br> COMPLAINT <br><br> *QUI TAM* ACTION PURSUANT TO 31 USC Sec. 3729 *et. seq.* and 41 USC Sec. 4712 <br><br> DEMAND FOR JURY TRIAL |

## I.  INTRODUCTION

1.     This is a *qui tam* action brought by Plaintiff-Relator Craig Beauchamp ("Relator")

for Defendants' violations of the United States False Claims Act, 31 U.S.C. Sec. 3729 *et seq*.

Relator alleges that Defendant presented or caused the presentation of false claims to the United

Page - 1 – COMPLAINT

States in connection with misuse of payments from the Department of Energy to build four Westinghouse AP-1000 nuclear power reactors to spec on schedule.

2.      By this False Claims Act action, Relator seeks to recover, on behalf of the United States and himself, civil penalties and damages arising from false claims for Defendants' knowing and intentional misuse of these payments from the Department of Energy.

3.      Additionally, Relator seeks to recover all relief necessary to make himself whole for Defendants' wrongful discharge of Relator because of lawful acts done by Relator in furtherance of an action under the False Claims Act and for Relator's efforts to stop one or more violations of the False Claims Act and under 41 U.S.C. Sec. 4712 for retaliatory discharge.

## II.  JURISDICTION AND VENUE

4.      Jurisdiction is conferred upon this Court by 31 U.S.C. Sec. 3730, 31 U.S.C. Sec. 3731, and 28 U.S.C. Sec. 1331.

5.      There has been no "public disclosure," as that term is used in 31 U.S.C. Sec. 3730(e)(4)(A), of the allegations or transactions upon which this action is based. Relator is an "original source" as that term is used in 31 U.S.C. Sec. 3730(e)(4)(B) of the information set out in this Complaint.

6.      Venue is appropriate in this District pursuant to 28 U.S.C. Sec. 1391(b)-( c) and 31 U.S.C. Sec. 3732(a) because one or more of Defendants has offices in this District, can be found in this District, transacts business in this District, and because the acts complained of took place in this District.

## III.  PARTIES

7.      Relator was at all material times a natural person residing in the State of Oregon

Page - 2 – COMPLAINT

and was employed by Defendant from June of 2014 until his termination became effective on June 17, 2015.

8. Defendant Chicago Bridge & Iron Company ("CB&I") is a private corporation that was, at all relevant times, licensed to do business in the State of Oregon. Defendant received and/or received money from the United States Government (Department of Energy) for the purpose of constructing nuclear power reactors. Defendant Lutech Resources, Inc. ("Lutech") is a private corporation that was, at all relevant times, licensed to do business in the State of Oregon. Defendant McDermott International, Inc. ("McDermott") is a private corporation that was, at all relevant times, licensed to do business in the State of Oregon.

### IV. RULE 9(b) FED. R. CIV. P. ALLEGATIONS

9. Much of the factual information necessary to prove the allegations in this Complaint is in the exclusive possession of Defendants or the United States; however, Relator provides substantial evidence along with this Complaint in his Relator's Disclosure Statement, supporting his allegations of fraud.

10. Each allegation herein is made upon information and belief and identifies a fact which Relator has, based upon his personal knowledge and experience working for one or more of Defendants for approximately one year, a reasoned basis to allege, but lacks complete detail.

### V. STATEMENT OF FACTS

11. Relator was hired by Defendant in June of 2014 as a Source Inspector.

12. At the time of his termination, in June of 2015, Relator was a Source Inspector. In this role, Relator focused on providing oversight of Sub-Suppliers that built individual modules for the AP-1000 nuclear power reactors being built for the Vogtle and VC Summers

Page - 3 – COMPLAINT

Power Stations in Georgia and South Carolina, respectively.

13.     Defendants received funds from the Department of Energy to build AP-1000 nuclear power reactors.

14.     In September of 2014, the sub-supplier, Greenberry Fabrication ("Greenberry"), had a massive ultra sonic testing ("UT") failure percentage on its first round of complete joint penetration ("CJP") weld testing.  Per the Westinghouse general notes, the CJP UT sample rate is 10%, if there is a single failure, an additional 10% of the adjacent material has to be tested.  If there is a single failure in that additional 10%, the mandated procedure is to perform 100% UT testing of CJP welds.  (In other words, two failures means there must be 100% testing.)  In September of 2014, Relator noticed that approximately 22% of the total weld length tested failed; three of four 19" welds failed, one of them for more than half its length.  These particular CJP welds are part of the floor of nuclear reactors and are related to safety and containment mechanisms.

15.     Relator informed his supervisor (Trevor Sprouse, Lead Source Inspector) about the failures and drafted a Notice of Unsatisfactory Condition ("NOUC"), which he gave to Sprouse.  Relator also raised his concerns with the Quality Control (Tom Dryer, Lead QC) at Greenberry.

16.     Immediately after raising these issues, Relator and his co-workers were informed that they were no longer permitted to use the bathroom at work and that Defendant would not increase its UT testing percentage per the General Notes and federal regulations.  The General Notes are the construction notes drafted by the designing engineers and located at the beginning of the print package.

Page - 4 – COMPLAINT

17. Relator told Sprouse that the problem was serious and needed to be addressed, yet Sprouse refused to submit the NOUC drafted by Relator.

18. In the Fall of 2014, Relator, again, raised concerns about the issue. Dryer performed an informational UT some time in late Fall. Dryer, under the supervision of Sprouse, was to determine whether or not there were additional failures. In the case that there were additional failures, a certified UT technician would be brought in for further testing. Relator opposed this procedure as it was outside the federal guidelines and wrote the PIC, Paul Summers, to inform him of the unconventional procedure; it was closer to getting an answer than no testing though. The result of the UT testing was the discovery of two class A discontinuities within the first few inches. When the official UT was performed, eight of nine welds failed. Defendant continued to refuse to move to 100% UT testing, and Sprouse, despite Realtor's continued urging, refused to pass along the NOUC authored by Relator.

19. Dryer claimed that it was too expensive to perform UTs on all the CJP welds. Relators' supervisors instructed him to grant variances on the issue, but refused to put the requests in writing.

20. Around this same time, the Nuclear Regulatory Commission closed Defendants' location its Louisiana (Lake Charles) location for noncompliance.

21. In and around October of 2014, Relator was sent to the Corvallis Greenberry plant to assist with document review. The Lead and Person in Charge at Greenbery were altering documents in order to expedite shipment of the modules with undocumented discontinuities. Defendants were aware of these alterations.

22. When Relator raised these issues with Defendants, he was instructed to not write

NOUCs. One specific example occurred when several angles were cut off a base plate, and, in the process, the base plate was gauged with the thermal cutting device. This type of incident requires the submission of an NOUC, yet Greenberry refused to do so, and, when Relator wrote an NOUC, Sprouse refused to deliver it.

23. In December of 2015, Sprouse started telling Relator to "throw out procedure." Sprouse told Relator that it was "cutting into production." Sprouse also instructed Relator that he was not to document discontinuities.

24. When Relator repeated his concerns, Sprouse told him that he could always look for a job elsewhere.

25. Around this same time, Sprouse started a "Get out of Jail Free" folder where he placed fake procedures to placate Relator and other SIs.

26. In December, Relator took over the level one duties. In doing so, Relator discovered more violations of the Nuclear Quality Assurance ("NQA") code and several sections of the Code of Federal Regulations ("CFR"). When Relator raised these issues with Sprouse, he threatened Relator and instructed relator to "stop making waves."

27. In January of 2015, Relator discovered a NOUC that Sprouse and Greenberry QC had closed without the proper documentation. Relator was reprimanded when he raised concerns about the NOUC.

28. In January of 2015, Relator was instructed to start accepting overlap when performing visual examination, a procedure which is not allowed under AWS or ASME codes, as doing so creates a stress riser that can cause crack propagation and possibly result in the catastrophic failure of a nuclear power reactor.

Page - 6 – COMPLAINT

29. On or around February 24, 2015, Relator was in the process of authoring a document to the Employee Concerns Program ("ECP"). Sprouse took Relator out for coffee and proceeded to threaten Relator, stating that if he continued to make waves, he would terminate Relator's employment and end his career.

30. Relator submitted the report to ECP, and ECP scheduled an investigator to visit the jobsite.

31. On March 18, 2015, Relator attended a training that the NRC required Defendants to hold. The next day, Sprouse informed Relator and his co-workers that an investigator was coming the next week in response to an anonymous report that had been filed. When he made the statement, Sprouse looked directly at Relator and said, "We all know that there will be retaliation. It might even be worse than just getting fired. Look what happened to Karen Silkwood. They murdered her."

32. Relator contacted the NRC. On or around March 26th, two Federal Special Agents visited Relator at his place of work to see if he was in immediate danger.

33. On or around March 30, Relator informed Sprouse, Paul Summers, Fred Smith (Manager) and Buck Blum (Head of Procurement) that he (Relator) had contacted the ECP and NRC.

34. On or around April 1, 2015, Relator was placed on administrative paid leave for an alleged, "weapons allegations."

35. On or around June 17, 2015, Relator was terminated from his position. The reason he was given is that his "services were no longer needed."

//

Page - 7 – COMPLAINT

ELIZABETH FARRELL
0324 SW Abernethy Street
Portland, OR 97239
(503) 277-2087

## VI.  APPLICABLE LAW

**A.     Federal Law**

36.     Nuclear Quality Assurance Code

37.     Nuclear Regulatory Commission

38.     Code of Federal Regulations

## VII.  FIRST CLAIM FOR RELIEF

**Violations of the False Claims Act - 31 U.S.C. ' 3729(a)(1) and (a)(2)**

39.     The allegations in the preceding paragraphs 1 through 38 are re-alleged as if fully set forth below.

40.     Defendants knowingly made false statements to the Department of Energy when bidding on jobs; undercut the work to increase profits; failed to perform required testing to improve their bottom line; and/or based their bids to the government on protocols/procedures that they, then, did not/do not follow (yet the government still paid for them).

41.     The United States Government has been damaged as a result of Defendants' violation of the False Claim Act.

42.     Defendants knowingly terminated Relator's employment in retaliation for Relator's opposition and repeated complaints regarding Defendant's misuse of government funds.

## VIII.  SECOND CLAIM FOR RELIEF

**Violations of 41 U.S.C. Sec. 4712**

43.     The allegations in the preceding paragraphs 1 through 38 are re-alleged as if fully

Page - 8 – COMPLAINT

set forth below.

44.     Defendants knowingly made false statements to the Department of Energy when bidding on jobs; undercut the work to increase profits; failed to perform required testing to improve their bottom line; and/or based their bids to the government on protocols/procedures that they, then, did not/do not follow (yet the government still paid for them).

45.     Defendants knowingly discriminated against Relator as a reprisal for disclosing to Defendants information that Relator reasonably believed to be evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, and/or an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract) or grant, when Defendants terminated Relator's employment.

**PRAYER**

Relator demands a jury trial on all questions of fact or combined questions of law and fact raised by this complaint.

WHEREFORE, Relator prays for, on behalf of himself and the United States of America, for judgment against Defendant as follows:

1.      Treble the amount of damage caused by Defendant as the result of its knowing non-compliance with federal laws.

2.      A civil penalty in the amount of $11,000.00 for each violation of the False Claims Act;

3.      An injunction ordering Defendant to institute and enforce effective quality control

Page - 9 – COMPLAINT

measures to prevent future violations;

4. Such other injunctive relieve as the court determines is appropriate;

5. Relator's lost wages and benefits of employment;

6. Relator's emotional distress damages;

7. Relator's attorney's fees and costs; and,

8. Relator further prays for a statutory share of either 25% or 30%, depending upon whether the United States intervenes, of all amounts collected or otherwise recognized by the United States in connection with the information Relator has supplied, together with his attorney fees, expenses of litigation, and costs of suit.

DATED this 16th day of June, 2018.

/s/ Elizabeth Farrell
Elizabeth Farrell, OSB# 011107
Attorney for Plaintiff-Relator